My name is Richard Levy for the appellate Mendoza. This is the speedy trial case. I think this case turns on the distinction between knowing you're under investigation and knowing there's been an indictment against you. As the Ingram case illustrates, the two are different. You can know you're under investigation or your company is under investigation, but investigations sometimes peter out without an indictment, or sometimes not everyone involved in the company gets indicted. So Mendoza knew that his clinic, Nobel Clinic, was under investigation, but he left before the indictment was handed up. Did he know that he was the focus of the investigation? There's no evidence that he knew he was the focus. He was... Or a focus of the investigation. He could have surmised... It couldn't have been too much of a surprise to him, could it? I'm sorry? It wasn't too much of a surprise to him, was it? Well, he considered himself a scapegoat, so I don't know, according to the record, so I don't know that he necessarily expected that he would be indicted. But the key thing, Judge Bybee, is even if he was certain that somewhere along the line he was going to be indicted, as Barker against Wingo points out, it's not defendant's obligation to bring himself to trial. The government knew how to contact him. He knew the government knew how to contact him. Well, the government doesn't really know how to contact him. They hope that if they call his family in the Philippines that they will get a message to him and that he may or may not return their call from a pay phone and refuse to divulge any further information as to how they can contact him in the future. That's not exactly the same as the government knowing how to contact him. That hope, though, Judge Bybee, was based on experience. The government contacted his wife here in the country. Mendoza returned the call not once but twice. Sure, it's possible to speculate, well, maybe the next time he's not going to return the call. But surely the government, knowing the track record of his returning calls, has at least the obligation to make that attempt, call the wife, call the relatives in the Philippines. This isn't an Elwha murder case. This was a one year, the guidelines were 10 to 16 months. So this is not the kind of case where the government could fear that if they let on that he was under indictment while he was in the Philippines, he may never come back. And, for example, the Brown case, even though there was no extradition treaty, the government, I'm sorry, not the Brown, McConaughey, even though there was no extradition treaty, the government was under an obligation to contact him in the foreign country. Maybe he voluntarily returned. And I think when you look at the cases in which the government, the court did find that the government was not negligent, so many times the opinion points out that the government made the effort to contact relatives. If I could just give a few to illustrate that are in the brief. In the most recent case, the United States against Sparrow case, the government contacted the guy's brother, let him know he was under indictment, warned him not to harbor a fugitive. In United States against Declu, the government sent letters to defendants, to the home of defendant's son. In Richards, the government visited the parent's house. In Aguirre, where there was a dissent, the Ninth Circuit case with a dissent, the dissent pointed out that the government did not contact any of Aguirre's relatives or friends who continued to live in Los Angeles after Aguirre moved out of state. Mr. Levy, what did the government have to do to satisfy a minimal burden? At the minimum, what did the government have to do? At a minimum, phone the wife or relatives. Is she the wife or is she now the ex-wife? Now the ex-wife. But at the time, they were not divorced until 2004, I believe. I don't know if that's from the probation report or it's in the record. They were married at the time, though. They were married at the time. So they don't divorce until 2004, which is the year he returns. After he returns. He returns in June of 2004. Right, right. So at any time between 1996 and 2004, they could have contacted the woman who was still his wife. Right. Now the woman did go to leave to the Philippines sometime later. When did she go to the Philippines? About a year or so after, a couple of years after Mendoza did. So that would have been what year? That would be 97 or 98. So what should the government have done between 1997 and 2004? But then the government had the phone number of the relatives in the Philippines. And there's no evidence in the record that that number was disconnected or... We don't really know because the government never tried it. Exactly. And the same thing, Judge Bivey, with the wife. The government didn't know.  If the government had tried, if the government sometime around, let's say 1998, for example, had called the wife and discovered that her phone was disconnected in California, because she had now left and gone to the Philippines, and then tried the number of the relatives in the Philippines and got no response or got a disconnected phone number, does that end the government's obligation? Under the circumstances, that probably would... There would be nothing more the government could do. Well, let me back up. What the government could have done, there was one more thing which the case has recognized, is place some kind of hold on the federal and state databases. As you recall, Judge Bivey, when Mendoza returned from the Philippines, this wasn't an illegal entry. He got his green card. He went through all the procedures, came in through a recognized customs office, and yet he was never flagged. It was only in October 2004, several months later, that he was flagged. I believe that was at a DMV office. I'm not sure if that's in the record. So that's one thing the government could have done. A very straightforward thing, which you'd think they'd do anyway, is place a hold or some kind of alert. Actually, some sort of warrant in the system. Yes. I'm sorry? A warrant. Yes, exactly, Judge Bivey. Another thing is they know he's in the Philippines. Under the McConaghy case, they would have some obligation to contact the Philippines through the American embassy and see if there's any contact information for him. Who knows, maybe after his wife came with him, he decided, well, since she's not my contact person anymore, I'd better let the embassy know how I can be reached. This is all speculation, but the government never even made the attempt of any of these things. So I would not say that they would have exhausted their remedies by calling the wife and calling the relatives. Who were the investigators? Was it the FBI or the? The Internal Revenue Service. Internal Revenue Service. Judge Bivey, yes. And do we know if they had any prior experience in dealing with foreign embassies or our embassy in any? We know that they were in contact with experts in the government because the agent Slottsby testified that he checked with his people in the government and they said there was no extradition treaty. So they could have, which by the way was technically true at the time in the indictment was handed up, but at that time in early 1996, the Philippines extradition treaty was already working its way through the Senate and it was passed, approved by the Senate in late 1996. And yet the government made no effort to say, well, hey, the treaty is going to be coming into force pretty soon. Let's put this on hold for six months and then we'll try again with extradition. There was no effort to do that. Is the treaty now in force? Yes, it is. When did the treaty go into force? In late 1996. It's U.S. Treaty 104-16. Was it applicable to Mr. Mendoza? By 1997, 1998, could they have sought extradition? Yes. There is nothing in the record on this or in the briefs, but I do want to point this out. The treaty does not list, it's not an extradition treaty by crimes. It's a treaty by terms of imprisonment, equivalence of terms of imprisonment. If the term of imprisonment is over a year in the U.S. and over a year in the Philippines, that's extraditable. And according to the committee report issued by Senator Helms, that includes tax evasion. The Philippine delegation also stated that the extradition is possible for offenses such as drug trafficking, terrorism, money laundering, tax fraud, or tax evasion, among other crimes. So it's not enumerated in the treaty, but under the one-year equivalence and under the understanding of the Senate, it would have been certainly worth a try. And in addition, the treaty, like most extradition treaties, has a voluntary return provision, similar to the McConaughey case. If you notify the Philippines through diplomatic channels, and the guy says, well, I'm willing to come back, I don't want to be on the lam all my life in the Philippines, then the treaty has a procedure for that. So the government could have arranged for that. And again, this is not a double murder case or anything. Okay. Time is up. I'll give you a minute for rebuttal. Thank you, Judge Helms. Good morning. I'm Elka Sager, and I represent the United States in this case. The critical issue in this case is whether or not it was the defendant or the government that was responsible for the delay. And in the record, it is clear that the reasons for the delay must be attributed to the defendant, who left the court's jurisdiction after he found out that he was under investigation. So the court didn't have any jurisdiction over him at that time, did it? Correct. He left the United States. He was free to leave, right? He was free to leave. And there was no indictment? Had he been told at that time or informed at that time that an indictment was going to be returned against him? He had been served with a grand jury subpoena for him. But that's not the same thing. Had he been informed that he was going to be indicted? No. Was he advised at all that he was a target of the investigation? He was advised that the government was investigating him, and they wanted handwriting and fingerprinting exemplars. Okay, but you have certain terms in your U.S. Attorney's Manual. Was he advised that he was a target? He was not formally advised that he was a target. He authorized his attorney to accept the service of a subpoena on his behalf. A subpoena was issued. He didn't show up for it. He then left for the Philippines.  And he had left both her and her children. She did not have any contact information for him. She knew that he had relatives in the Philippines, and she provided a phone number for those relatives. Now, the government was unable to contact him after he left for the Philippines. They only had the phone number for the relatives. But he returned the call twice. He returned the call twice. The first time, he did not speak to the agent who called him, the IRS agent. He spoke to an FBI agent and said he wanted immunity. The following day, he called back. He spoke to the IRS agent. Now, this was not the agent that was investigating him in Los Angeles. This was an agent who was located in Seattle and was attempting to not only effectuate service of the subpoena that the Los Angeles agent had issued, but also to question the defendant about similar activities in the Seattle area. So the defendant actually had a history of fleeing twice. He fled Los Angeles for Seattle when he knew that there were some questions that were coming up regarding this issue of cashing checks. The clinic was under a civil audit, and he was questioned during the audit about checks that he had cashed. He then took off for Seattle. Was he indicted for that? No, he was not indicted for that. The agent in Seattle, when the defendant phoned him and spoke to him, the agent asked him about his activities in Seattle. He said he believed he'd been used as a scapegoat. And then he said he was selling property in the Philippines to make some money so that he could return to California to defend himself. And he said he would return in two months. Now, he didn't return for over eight years. Counsel misstates the record when he says that the government had the ability to contact the defendant through contacting his wife. First of all, the wife testified at trial that she left for the Philippines sometime in 1996. So after she left the United States, the government would not have been able to contact her to find the defendant. Secondly... How long did she remain? What was the period of time that she was still in the United States after the indictment had been returned? The indictment was returned in April of 1996. She was contacted in early January 1996, and she testified that she left sometime in 1996. So it's not even clear whether she left before the indictment was issued in April or afterward. Here's the problem that I have. After Doggett, it looks like the government has an obligation to try and inform somebody that they are under indictment. And that way, it avoids the problem that we have here that there may be prejudice to Mr. Mendoza's case because of diminished witness memories and collecting evidence and so forth. The government didn't even try to contact... This turns out to be sort of fortuitous, right? It turns out that on reflection, she's gone, so it would have been futile. But you don't know that in 1996, do you? That's correct. So you didn't try and contact the wife. You had a phone number in the Philippines of his relatives. He's contacted the government twice in response to government inquiries prior to the indictment. Now, since he doesn't know he's under indictment, if you call him a third time, there might be a good chance that he'll return the call. That's possible. He may plead for immunity. He may ask for a lot of things. You didn't make the phone call. That's correct, but the government was in this... Hobson's choice of, what do you do? He's been indicted. He has a history of fleeing. When he was served with a grand jury subpoena, he didn't show up. He took off. Okay, but if he leaves the Philippines and goes to Thailand, are you worse off than when he's sitting in the Philippines and you think that you don't have a way of getting him back under the treaty? You haven't even gotten to the question of the treaty yet. But you think you can't get him under the treaty. The agent testified that he did place the fact that he had been indicted and the outstanding warrant was placed in available law enforcement databases. Is he supposed to look on the Internet or something? Can he find it on the Internet? The indictment was not sealed. Okay, so how does he find it? Well, he... If he's really curious, how does he find out that he's been indicted?  the defendant has some sort of contact with the government through an attorney. Right. We haven't got that, though. That's right. He made absolutely no effort to... To call up and find out whether he'd been indicted in the last couple of weeks. Well, he clearly was evading detection. He didn't want to leave his contact information. He said he was calling from a pay phone. He could have left a phone number. He could have told the agent when he spoke to him. Okay, counsel, let me just cut to what's really bothering me, and that is the Doggett case. All of these arguments, I think, would probably be sympathetic to me if we were pre-Doggett. But after Doggett, the Supreme Court has appeared to create an obligation on the part of the government to at least try to alert somebody that they have been indicted. Do you have anything that the government did here to try and let him know that he had been indicted? I know if he places a phone call to L.A., somebody will look it up in the records and tell him. Did you make any phone calls whatsoever? No. The government had him in available databases, and in the Aguirre case this court held that when the defendant was in England at the time he was indicted, the government did nothing more than place information about the fact that he had been indicted and the arrest warrant in law enforcement databases. And when the defendant then returned from England, moved to Arizona, lived there for several years, and was indicted when he was crossing the border from Arizona to Mexico, that was held not to be a violation of his speedy trial rights, despite the fact that there was a five-year gap between the time that he had been indicted and the time of his arrest. Now, in this situation, it's distinguishable from Doggett because in Doggett, the defendant had returned to the United States and was living openly under his own name, and the court found that the government could have found the defendant with reasonable diligence. But in this case, there was really nothing that the government could have done. The government was entitled to, based on its experience and judgment, make a decision not to notify the defendant's relatives that he had been indicted because that would likely have been counterproductive. Had the defendant known... But you just qualified it by saying likely. Why didn't somebody try? If you came in here and had an affidavit from an IRS agent and said, I placed two phone calls in 1997 to the only number I had, and my phone calls didn't get returned, I didn't know what else to do, this would be a very, very different case. The agent testified that he placed the information in the databases and that the defendant was arrested when a customs agent ran his name through the database when he went to the Long Beach port to pick up his belongings. So he was eventually picked up... After he got into the country. After he got into the country. So he came into the country with all the necessary permissions and nobody picked it up on our side. That's correct. And there is no explanation for that. But the government was entitled to make the conscious decision not to notify his relatives based on the defendant's history, his history of fleeing, his history of not being cooperative in terms of giving contact information. But if you're afraid that he's going to jump to another country, then you've made a strategic decision not to contact him. And you run the risk then that you're going to run square into Doggett, don't you? Isn't that the risk that the government runs here? Yes. You may be caught between a little bit of a rock and a hard place, but you know that after Doggett, you have an obligation to advise him that he's been indicted. That's... You have an obligation to exercise reasonable diligence in looking for him. So if he is living openly under his own name in the United States, he's not using any aliases, he's not evading detection, then you have an obligation to make periodic inquiry and try to locate him. But when the defendant is in a foreign country, and when the government is unable to secure his presence in the United States through extradition, all that's in the record regarding that issue is that the agent contacted his supervisors regarding the possibility of seeking extradition and was told that there was no extradition for tax offenses under the treaty with the Philippines. Okay. Now, Mr. Levy has told us that there was a treaty that was enacted in 1997? 1996. And that... You don't know anything about that treaty? No. And when the agent testified to his belief regarding the treaty, that fact was not challenged, nor is it anywhere... Okay. So if anything, that would be under a plain error standard if we thought that that was a relevant fact. Correct. And it was... The defendant testified that he found out about the agent's phone call not from his wife, but from his sister in the Philippines who said that an agent had telephoned and left his contact information. At no time did the defendant make it... I think this would be a different case if the defendant had left contact information. At trial, he testified that the reason he didn't provide any contact information was because he was traveling around the Philippines and was not locatable. Nevertheless, he could have, if he wanted to, check in with the government. Clearly, he knew that he was under... At the time he made the second phone call, he knew that he was under investigation both in California and that he was also wanted for questioning in Seattle. He said he would return, and he didn't. Even if this court finds that the government was negligent in failing to contact the defendant, that just gives rise to presumed prejudice. And in this case, that presumption has been rebutted. You have all your time. Thank you. Just a couple of points. I think this case boils down to what Judge Bybee said, which is he didn't make the phone call. That's the least they should have done. As far as when the wife left for the Philippines, she testified in RT for April 26 on page 103-04. In April 96, she joined him in the Philippines almost two years later. So since he left in 95, she's probably misrecollecting the year. It sounds more like 1997. But in any event, the point is the government did not even make the effort. He did not promise, unlike Aguirre, the Aguirre case, he did not promise to return in a couple months. He said he's there to sell some property and he planned to return in a couple months after he did that to defend himself. When he didn't hear anything further, why return? Why sell property? He can just fairly assume that he's no longer under investigation. And the idea that he has to call every week or two to check in, why haven't you indicted me yet? Please let me know. Have you forgotten me? Check to see whether I should be indicted. Of course, the defendant has no obligation whatsoever to do that. He did not flee to Seattle and flee to the Philippines. His business, the Nobel Clinic, went out of business. He had to support himself. He went to Seattle, which is in this country, to find one job, and when that fell through, he went to the Philippines to work to support himself. The spin that he's fleeing from place to place, I don't think is tenable. Okay, thank you. The matter will be submitted. Thank you.
judges: Nelson, Paez, Bybee